IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LANA S. CARVER, as Next Friend of BARBARA
LINGLE and Personal Representative of the Estate
of ROBERT and ELLEN JOHNSON, deceased,

    Plaintiff,

v.                                                                                                                        No. 8-CV-922 WJ/RLP

UNITED STATES OF AMERICA,

    Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Defendant United States of America's Motion to Dismiss and/or for Summary Judgment (Doc. 59). Plaintiff Carver filed suit against the United States after Robert and Ellen Johnson were killed in a motor vehicle accident on Kirtland Air Force Base in Albuquerque, New Mexico. Carver alleges that the United States was negligent in failing to post adequate traffic signs on the road on which the Johnsons were traveling and failing to provide safe traffic control and design of the road. Because Carver's claims are barred by the discretionary function exception of the Federal Tort Claims Act, this Court GRANTS Defendant's Motion to Dismiss.

**BACKGROUND**

At about 9:30 a.m. on December 19, 2007, Robert Johnson, an 85-year-old Air Force retiree, was driving his car westbound on the Pad 5 Taxiway of the Kirtland Air Force Base in Albuquerque, New Mexico. His wife, Ellen Johnson, was riding in the passenger seat. At the

same time, Louis Duran, an employee of Ace Metals, Inc., was traveling southbound on South Gate Road[1] at a speed of about twenty to thirty-file miles per hour.  Although the weather conditions were clear and sunny and there was nothing obstructing his view, Mr. Duran did not see the Johnsons' car and struck the car at the intersection of the Pad 5 Taxiway and South Gate Road.  Both Robert and Ellen Johnson suffered extensive injuries and died days later—Ellen Johnson died the following day without ever regaining consciousness and Robert Johnson died on December 23, 2007.

The Pad 5 is primarily used by the United States Department of Defense to park, load and offload cargo aircraft.  The Pad 5 area is patrolled by military security personnel.  The Pad 5 taxiway is the paved, curved road connecting Pad 5 to the airport runway.  There are no traffic controls, such as a traffic signal, stop sign or yield sign at the convergence of the Pad 5 Taxiway and the South Gate Road.  Immediately to the west of the Pad 5 Taxiway is the east-west runway for the Albuquerque International Airport.  The Johnsons were driving westbound on the Pad 5 Taxiway, away from the Pad 5 and towards the east-bound runway.  In fact, if the accident had not occurred and the Johnsons had continued in the direction they were traveling, they would have been driving westbound on this runway.

It is unclear why the Johnsons were traveling on the Pad 5 Taxiway or how they arrived on the taxiway.  Assuming the Johnsons entered from the east, there are three gates from which the Johnsons could have reached the Pad 5 Taxiway.  Mission requirements and special security conditions determine whether or not a gate will be open or closed at any given time.  The first two gates are usually locked and only open for special functions.  The third, southernmost gate is

---

[1] In their depositions, the witnesses sometimes refer to this road as Randolph Avenue.

not locked and provides access to base personnel who work to the south as well as personnel who work in the area of Pad 5.  Shortly after the entrance to the third gate, the road divides.  Civilian personnel who enter through this gate could turn south to reach their place of business.  Military or security personnel could turn north to reach the Pad 5 Taxiway.

Plaintiff Lana Carver, as personal representative of the estate of Robert and Ellen Johnson, as well as next friend of Barbara Lingle (the Johnsons' daughter), filed this suit against the United States under the Federal Tort Claims Act alleging negligence, wrongful death and loss of consortium.  Specifically, Plaintiff alleges that the United States was negligent in: (1) failing to use ordinary care to prevent an accident; (2) failing to properly maintain the roads; (3) failing to keep proper and adequate signage on the road; and (4) failing to provide safe traffic control and design of the road.  Complaint, at 5.  The United States then filed this Motion, arguing that it is immune from suit under the discretionary function exception of the Federal Tort Claims Act.

## MOTION TO DISMISS

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a court to dismiss a complaint for lack of subject matter jurisdiction.  A court does not have jurisdiction over a suit against the United States unless the United States, through an Act of Congress, has explicitly consented to suit.  *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  The party bringing suit against the United States has the burden of proving that sovereign immunity has been waived.  *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992).  In addressing a Motion to Dismiss, the court must accept as true all well-pled and supported allegations in the complaint.  *E.F.W. v. St. Stephen's Indian High School*, 264 F.3d 1296, 1303 (2001).

## ANALYSIS

The Federal Tort Claims Act waives the United States' immunity for certain tort claims. Specifically, it authorizes suits for money damages for injury "caused by the negligent or wrongful act or omission of any employee of the government . . . ." 28 U.S.C. § 1346(b). However, Congress exempted the United States from liability for any claims based upon the exercise of discretionary functions by government employees. This provision, known as the "discretionary function exception", provides that the United States is not liable for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception exists because Congress wanted to protect the ability of governmental decision-makers to use their discretion when such discretion is permitted by law.

In order for the discretionary function exception to apply, the decision or action at issue must meet a two-part test. *Black Hills Aviation, Inc. v. United States*, 34 F.3d 968, 972 (10th Cir. 1994) (citing *Berkovitz v. United States*, 486 U.S. 531, 536-37 (1988)). First, the challenged decision must "involve an element of judgment or choice." *Id.* If a mandatory statute, regulation or policy requires a particular course of action, then no discretion is involved and the discretionary function exception does not apply. *Id.* If, on the other hand, the government's action is not controlled by such a directive, then the court proceeds to the second step of the analysis and determine whether the discretion involved "is the kind that the discretionary function was designed to shield." *Id.* at 973. According to the Supreme Court, the discretionary function exception was designed to shield decisions made for public policy reasons—such as decisions grounded in social, economic, and political policy. *Id.* (citing *Berkovitz*, 486 U.S. at

537). It is not necessary for the government actor to make an actual, conscious decision based on policy factors, *see Kiehn v. United States*, 984 F.3d 1100, 1105 (10th Cir. 1993); rather, it is sufficient if the decision at issue is susceptible to policy analysis, *United States v. Gaubert*, 499 U.S. 315, 325 (1991). The Court will address the two parts of this test in turn.

**I. Does the decision involve an element of judgment or choice?**

First, the Court must determine whether the United States' decision not to post traffic signs at the convergence of the Pad 5 Taxiway and the South Gate Road involved an element of judgment or choice. The parties dispute whether this choice truly involved discretion or whether the United States was required to post traffic signs in accordance with federal policy. The Manual on Uniform Traffic Control Devices for Streets and Highways ("the Manual") governs traffic control on roadways.[2] The United States offers three reasons why it lawfully used discretion when deciding not to post signs at the intersection. First, it argues that the Pad 5 Taxiway is a taxiway, not a roadway, and therefore is not subject to the standards laid out in the Manual. Second, it argues that even if the Pad 5 Taxiway is considered a roadway, it qualifies as a low-volume road under the Manual. The Manual does not mandate stop or yield signs on low-volume roads, but only suggests that they be considered for use when certain conditions apply. Finally, the United States argues that the Manual permits discretion in the placement of regulatory signs even for roadways of standard volume.

---

[2] Technically, the Air Force Manual 32-1017, DOD Transportation Engineering Program, November 2003, governs traffic control of roadways on Air Force bases. However, the Air Force Manual states that "[a]ll installation traffic signals, signs and pavement markings will be in substantial compliance to FHWA's Manual on Uniform Traffic Control Devices for Streets and Highways." ¶ 3-11c.(3)(c). In other words, the Air Force Manual incorporates the rules of the Manual for Air Force bases. Notably, however, it only requires the bases to be in substantial, rather than total, compliance with the Manual.

The Court need not address the Government's first two arguments. Even assuming that the Pad 5 Taxiway qualifies as a roadway[3] and even assuming that a substantial volume of traffic utilizes this roadway (two assumptions which the evidence renders highly unlikely), the Manual still does not require the use of stop or yield signs at the intersection of the Pad 5 Taxiway and the South Gate Road. The relevant sections of the Manual clearly give the governing body discretion regarding where to place regulatory signs.

> **Section 2B.05  STOP Sign Applications**
> Guidance:
> STOP signs should be used if engineering judgment indicates that one or more of the following conditions exist:
> A.   Intersection of a less important road with a main road where application of the normal right-of-way rule would not be expected to provide reasonable compliance with the law;
> B.   Street entering a through highway or street;
> C.   Unsignalized intersection in a signalized area; and/or
> D.   High speeds, restricted view, or crash records indicate a need for control by the STOP sign.
>
> **Section 2B.09  YIELD Sign Applications**
> Option:
> YIELD signs may be used instead of STOP signs if engineering judgment indicates that one or more of the following conditions exist:
> A.   When the ability to see all potentially conflicting traffic is sufficient to allow a road user traveling at the posted speed, the 85th-percentile speed,

---

[3] The Manual defines a "roadway" as "that portion of a highway improved, designed or ordinarily used for vehicular travel and parking lanes." Sect. 1A.13.65. The only evidence that Plaintiff proffers in support of her allegation that the Pad 5 Taxiway qualifies as a roadway is the unsupported (and often wavering) assertions of Plaintiff's expert, Robert Burch, who visited the site on one occasion for 45 minutes. Plaintiff's Exhibit 3, at 29, 35, 48, 69-70. Every other witness, including Plaintiff's other expert witness, Derek Swinson, recognized this road as a taxiway. Mr. Duran, who travels the South Gate Road multiple times every day for his job delivering supplies to various parts of the base testified that he had never seen a vehicle travel westbound across South Gate Road except for occasional police Humvees. U.S. Exhibit 1, at 60. He also testified that he has never seen any vehicles on the Pad 5 Taxiway except maintenance vehicles which were only present when a place was parked on the Pad 5. *Id.* at 47. The presence of occasional vehicles on a taxiway does not convert a taxiway into a roadway subject to the Manual.

          or the statutory speed to pass through the intersection or to stop in a reasonably safe manner.
- B. If controlling a merge-type movement on the entering roadway where acceleration geometry and/or sight distance is not adequate for merging traffic operation.
- C. The second crossroad of a divided highway, where the median width at the intersection is 9 m (30 ft) or greater. In this case, a STOP sign may be installed at the entrance to the first roadway of a divided highway, and a YIELD sign may be installed at the entrance to the second roadway.
- D. An intersection where a special problem exists and where engineering judgment indicates the problem to be susceptible to correction by the use of the YIELD sign.

The Manual itself characterizes its recommendations as "guidance" and "options" rather than requirements or mandates. Instead of stating that stop signs "shall" or "must" be used in certain circumstances, the Manual only suggests that stop signs "should be used" in certain circumstances subject to engineering judgment. Even Plaintiff's expert, Robert Birch, admitted that the Manual did not require a stop or yield sign at the intersection in question.

> Q. Let me ask this question: Are you saying that anything in the [Manual] makes it mandatory that there be some type of traffic control device at this intersection?
> A. No. . . .
> Q. Engineering studies aside, are you telling me today there's anything contained in the [Manual] that makes signage at this intersection mandatory?
> A. No.
> Q. Same answer?
> A. Same answer.

U.S. Exhibit 6, at 55-56. Without any evidence that the Manual *requires* either a stop or yield sign at that intersection, the Court assumes that such the decision to use one or not falls within the lawful discretion of the United States. This decision of this Court is consistent with that of other courts which have found the Manual to be discretionary in nature. *See, e.g.*, *Hayes v. United States*, 539 F.Supp.2d 393, 401 (D.D.C. 2008) (holding that the Manual serves as a guidebook, rather than a prescription, for the installation of signs and that the use of the word

"should" does not constitute a mandatory requirement); *Kastendieck v. Bd. of County Commr's of Morris County, Kansas*, 934 F. Supp. 387, 392 (D. Kan. 1996) (holding that Manual did not require the County to place curve delineators a certain width apart to mark a curve in the road); *Sanchez v. Bellefeuille*, 855 F.Supp. 587, 592-93 (N.D.N.Y. 1994) (holding that the use of the word "should" does not dictate a mandatory requirement).[4]

**II. Is this decision the type the discretionary function exception was designed to protect?**

This Court must next determine whether the decision not to post signs at the intersection of South Gate Road and the Pad 5 Taxiway is the type of policy-grounded decision the discretionary function exception was designed to protect. Where agency policy allows the government to exercise discretion, there is a "strong presumption" that the discretionary acts authorized by the policy are grounded in public policy. *United States v. Gaubert*, 499 U.S. 315, 324 (1991). Here, policy considerations come into play even more forcefully because the decision involved traffic control on an air force base. As the United States notes, the Tenth Circuit applies the discretionary function exception liberally as it pertains to operations on military bases. *See Ross v. United States*, 129 F. App'x 449, 451 (10th Cir. 2005) (expressing "little doubt" that the decisions surrounding the operation of an air force base involve policy decisions of the most basic kind). *See also Aragon v. United States*, 146 F.3d 819 (10th Cir. 1998); *Fullmer v. United States*, 166 F.3d 1220 (10th Cir. 1999); *Black Hills Aviation*, 34 F.3d 968 (10th Cir. 1994).

---

[4] To the extent that Plaintiff is also arguing that the United States should have posted directional signs at the southernmost gate off Pennsylvania Avenue (through which Plaintiff speculates the Johnsons entered the base) or restricted access through that gate, this claim is dismissed. Neither party has put forth any evidence that the Johnsons entered through any particular gate. Mr. Burch, Plaintiff's expert, admitted that the Johnsons could have entered through several locations. Plaintiff's Exhibit 3, at 40-41. Furthermore, Plaintiff has pointed to no statute or regulation which would require the United States to close the gate or post directional signs at the entrance.

## CONCLUSION

This Court finds that the decisions at issue in this case are not controlled by any mandatory statute, regulation or policy.  Rather, the decisions concerning traffic control on an air force base are lawfully within the discretion of the United States.  Furthermore, these decisions are clearly susceptible to policy considerations, especially because they concern the safety and operations of a military installation.  Accordingly, the decisions at issue fall under the discretionary function exception of the Federal Tort Claims Act.  Because this Court lacks jurisdiction over Plaintiff's claims, those claims are hereby DISMISSED.

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE